J-S07031-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: THE ADOPTION OF: K.C.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1285 WDA 2021 |

Appeal from the Order Entered October 7, 2021
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s): 2021-291-IVT

BEFORE: OLSON, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:         **FILED: MARCH 23, 2022**

K.W. (Father) appeals from the order entered in the Court of Common Pleas of Cambria County (orphans' court) granting the petition filed by Cambria County Children and Youth Services (CYS) to involuntarily terminate his parental rights to K.C.W. (Child) (d.o.b. February 2020) pursuant to the Adoption Act, 23 Pa.C.S. § 2511 (a)(1), (2), (5), (8) and (b).[1] He argues that he would have made progress toward reunification if it were not for the Covid-19 pandemic and his incarceration. We affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The October 7, 2021 order also involuntarily terminated the parental rights of A.B.S. (Mother) to Child. She has appealed the order at docket number 1301 WDA 2021 and is not the subject of this appeal. She will only be mentioned to the extent necessary to provide a full picture of the pertinent events.

We take the following factual background and procedural history from our independent review of the record and the trial court's October 6, 2021 opinion.

**I.**

**A.**

CYS became involved in this case when Mother tested positive for marijuana at the time of Child's birth in February 2020. Upon being notified of Mother's positive drug test, CYS did an investigation that revealed severe behavioral health, financial and domestic violence issues, as well as the fact that the house where the parents resided was unsafe for Child. Father also had outstanding criminal warrants, a history of substance abuse and domestic violence. Both parents had the aggravating circumstance that their parental rights to all of their other children had been involuntarily terminated. CYS took custody of Child in the hospital two days after her birth and Child has not been returned to parents' care. Despite the aggravating circumstances, which could have relieved CYS of its obligations to provide Father with the opportunity for reunification, the agency elected to move ahead to assist him in this effort. (***See*** N.T. Termination of Parental Rights (TPR) Hearing, 6/28/21, at 37).

After a February 24, 2020 adjudicatory hearing, the orphans' court issued an order in which it directed that Father was to abide by the Family Service/Permanency Plan in which he was to follow through with all

recommendations from his psychological evaluations; successfully complete parenting skills classes; undergo drug and alcohol assessments and random drug screenings; not be aggressive or violent toward anyone; participate in anger management and impulse control therapy/counseling; maintain a safe, clean, adequately furnished home; take all appropriate steps to resolve outstanding criminal proceedings and warrants; and cooperate fully with all scheduled visits with CYS caseworkers and service providers, including Independent Family Services, Inc. (IFS) and the Blair Foundation. Due to Father's substance abuse issues and depending on his level of intoxication, the court ordered that he may not visit with or hold Child if he had a positive drug/alcohol screen. (*See id.* at 18-19). The order also expressly provided:

> [Mother] and [Father] are not to threaten, harass, or use vulgarity toward [CYS] caseworker[s] or any service providers. These actions will result in the filing of a criminal complaint. [Mother] and [Father] are not to take any actions to instigate others to make threats toward [CYS] staff.

(Order, 3/02/20, at Finding of Fact 15); (Orphans' Ct. Op., at 5-6); (N.T. TPR Hearing, 6/28/21, 18-19). The placement plan was reunification, with a projected achievement date of six months, and the concurrent goal was to place Child with a fit and willing relative, if identified.

On February 26, 2020, licensed psychologist Dennis M. Kashurba evaluated Father to ascertain the appropriate services for him to demonstrate parenting potential for Child.

On July 27, 2020, the court held a permanency review hearing. It found both parents minimally compliant, with both struggling to cooperate with recommended services. Each had made only minimal progress in alleviating the circumstances that necessitated placement. The Permanency Plan provided that the goal continued to be reunification, with a concurrent goal of adoption. Father and Mother were to continue with the steps outlined in the March 2, 2020 order, supervised visits were established and both were to continue to refrain from threatening conduct with caseworkers and service providers. (*See* Orphans' Ct. Op., at 7).

After a January 27, 2021 permanency review hearing, the court ordered the goal changed from reunification to adoption. It again determined that Father and Mother were only minimally compliant with the Permanency Plan and were not cooperating with CYS or other providers. Child had been in placement for eleven months at that time. In its February 9, 2021 order, the orphans' court specifically found:

- [C]hild has been in placement since February of 2020.

- The parents had failed to comply with the requirements of [C]hild's Permanency Plan.

- Both parents had active criminal cases.

- Mother still used illegal, unprescribed marijuana.

- Each parent had produced positive drug screens.

- Father tested positive multiple times using different illegal substances.

- The parties continued to engage in domestic violence.

- Father has a history of drug abuse.

- Father was not compliant with service providers.

- The parents had been verbally aggressive with the agency caseworkers and service providers.

- The parents were discharged from anger management classes at IFS due to noncompliance and being verbally aggressive.

- The parents had not followed through with the recommendations of their psychological evaluations.

- Mother continues to not address her mental health issues.

- Aggravating circumstances existed as to both parties as a result of prior involuntary termination proceedings.

- [C]hild needs a permanent, consistent environment.

- CYS has exhausted all available resources.

- [C]hild's best interest requires a goal change to adoption, and the agency has met its burden of proof by clear and convincing evidence.

(Orphans' Ct. Op., at 9-10); (***see also*** N.T. TPR Hearing, 6/28/21, at 22-23).

**B.**

On March 4, 2021, CYS filed a petition to involuntarily terminate the

parental rights of Child's parents pursuant to 23 Pa.C.S. § 2511(a)(1), (2),

(5) and (8) and (b) because of severe behavioral health, financial, substance

abuse, shelter and domestic violence issues.[2]  (**See** N.T. TPR Hearing, 6/28/21, at 12).  At that time, Child had been out of parents' care for over twelve months.  The court held hearings on June 28, 2021, September 13, 2021, and September 15, 2021.  CYS produced the testimony of Barb Lusczek, CYS caseworker; Dennis Kashurba, licensed psychologist; Jennifer Drager, Executive Director for In-Home Family Services with IFS; Tami Yeckley, CFS caseworker; May Popovich, CYS casework supervisor; Julia Bloom, family advocate with the Blair Foundation Path House; and Kathy Scaife of IFS. Father testified on his own behalf.

**1.**

Ms. Lusczek was the CYS caseworker in this matter from mid-February 2021 forward.[3]  She testified that the juvenile court found aggravating circumstances because both parents had their parental rights to a combined total of seven other children terminated in Blair (Mother) and Dauphin (Father) Counties.  Although Father cooperated somewhat by completing the psychological evaluation, attending parenting classes and showing some

---

[2] The orphans' court appointed counsel for each parent and Child.  Because of Child's age, the court determined there was no conflict between Child's legal and best interests.

[3] Ms. Lusczek was the third CYS caseworker in this matter.  Ms. Cathy Gorba was the intake caseworker.  Ms. Chloe Barrett was the caseworker when Child came into placement until February 2021 when, as described more above, Father made the threats that formed the basis for his guilty plea to terroristic threats.  (**See** N.T. TPR Hearing, 6/28/21, at 47).

interest in working with IFS for anger management, he was more focused on social media and blaming others for the removal of Child than on doing what the court had required of him. She further testified that his long-time drug addiction was the biggest barrier to reunification and that he had produced multiple positive drug screens throughout this case. (*See* N.T. Hearing, 6/28/21, at 16, 20-22, 34).

CYS initially scheduled weekly one-hour in-person visits with Child, but from March 2020 until May 2020, the visits were changed to half-hour virtual visits twice a week due to Covid-19. Thereafter, they returned to in-person visits. At the time of the June 28, 2021 TPR hearing, the last time Father had seen Child was in January 2021. At the visits, neither parent was attentive to Child's needs because they were so focused on arguing with each other. She did not believe that the parents would put Child's needs and welfare first. Father had not done anything to show CYS that he could perform parental duties on behalf of Child or that he would do what was necessary to enable him to do so. Specifically, although he attended some parenting classes and complied with getting the psychological evaluation, "there has been no follow[-]through, no change in lifestyle, no application of what was learned through the visits." Ms. Lusczek assumed Father was drug-free at the time of the June 28, 2021 TPR hearing because of being incarcerated, but stated that he has not voluntarily remedied any issues and will have to deal with sobriety when no longer confined. Father also relied on Mother for his housing, and

there were still domestic violence, anger management and parenting issues. (*See id.* at 23, 25-26, 29-31, 38).

Ms. Lusczek testified that by the time of the June 28, 2021 hearing, Father had produced eight positive drug screens, continued to engage in domestic violence, had not been compliant with the service providers, had been verbally aggressive with CYS caseworkers and service providers and had not followed through on recommendations. Additionally, Father threatened his CYS caseworker, Ms. Barrett, and her child, in February 2021, resulting in charges being filed and his guilty plea to terroristic threats. As a result of this guilty plea, Father was incarcerated and unable to visit with Child. (*See id.* at 22, 27-28).

Neither parent had done anything to demonstrate that they were able to meet the emotional, physical, daily needs of Child or to take responsibility for her initial removal. Instead, their focus remained on blaming CYS, their caseworker, service providers and the foster family. (*See id.* at 31).

Ms. Lusczek stated that Child was developmentally on target, bonded with her foster family[4] and was doing well with them. She was sixteen-months-old at the time of the June 28, 2021 TPR hearing and had been with

_____

[4] The foster family is an adoptive resource and Child's sibling also lives with them. (*See* N.T. TPR Hearing, 9/13/21, at 63).

the foster family for approximately one year at that time. The foster family ensured that all of Child's needs were met. (*See id.* at 24-25).

CYS believed that it would be in Child's best interest to be adopted due to drug and alcohol concerns about Father and his failure to do what he needed to do to make a life better for Child. Ms. Lusczek testified that there was no bond between Child and Father and severing his parental rights would not negatively impact Child. It would promote her developmental, physical and emotional needs because she was doing so well in her foster home and bonded with the foster parents. She stated that a bond could have been developed with the infant Child despite Covid-19 restrictions because she has seen it happen in other families. (*See id.* at 34-36, 60).

**2.**

Ms. Popovich worked with Father in her supervisory role at CYS beginning in early March 2020. CYS investigated Child's home after receiving the referral upon her birth and discovered that there was no hot water or refrigerator, there were bedbugs and the home was in deplorable condition. There were extreme anger issues, both Father and Mother committed domestic violence and Father had several criminal charges and drug issues. She described Child's parents as being extremely argumentative and uncooperative, explaining that she had worked with many families in her nearly ten-year career with CYS and had "never been called so many F-words and swear words and stuff as [she] was with this family." (N.T. TPR Hearing,

9/13/21, at 43). "They continuously harassed the caseworker[, her,] their attorneys and a judge on Facebook. They were very aggressive." (*Id.*). Although they initially signed releases for medical and therapeutic records, they revoked them when the goal was changed to adoption. They refused to meet with the CYS caseworker or to allow her to enter the home to assess if they had made any recommended changes. (*See* at 42-44, 47-48).

To explain the argumentative, contentious and threatening situation created by the parents, Ms. Popovich also testified about CYS filing a contempt action against the parents for violating the Court's March 2, 2020 order directing them to refrain from threatening, harassing or using vulgarity toward CYS caseworkers or service providers. She explained that their numerous social media posts demonstrated that they did not appear at all concerned about Child, but instead claimed they were victims themselves, calling CYS kidnappers and accusing them of sex trafficking and of allowing children to be sexually abused by putting them into the Mennonite sect. They harassed CYS caseworkers on social media that were not even involved in this case, posted photographs, phone numbers and court documents in an attempt to gain sympathy for themselves and made accusations about anyone in the court system involved in their case, including a judge and their own attorney. Both parents were held in contempt. (*See id.* at 49-53).

She also testified about Father's terroristic threats incident. She said that consistent with his threatening social media behavior, on the February

2021 day in question, he was driving his car when he saw his caseworker, Ms. Barrett, outside shoveling snow. He turned the car around, got out and threatened both her and her child. CYS removed Ms. Barrett from the case and had to move her to another location. Her child went to live with relatives out of fear for the child's safety. (*See id.* at 48-49, 58).

Ms. Popovich also explained that although Father and Mother were referred to IFS for anger management, they were uncooperative and unsuccessfully discharged. Father was referred for drug and alcohol services but was discharged due to his disruptive behavior and his failure to follow through with all meetings. He tested positive for drugs and was put on a Suboxone treatment, but because he refused to sign releases, CYS did not have any further information on that or if he sought anger management services elsewhere as directed. (*See id.* at 55-56).

When asked if Father and Mother were receiving a lesser standard of care in the reunification attempt due to their treatment of CYS, Ms. Popovich responded that they actually got more than most cases did. For example, most cases have one visit per week with a child, while they were given two. They were provided with every service available to CYS and they chose not to work with them. When they seemed unable to work with CYS service providers, CYS suggested other sources they could use. Thus, CYS was providing them with everything they needed to achieve reunification. (*See id.* at 65).

**3.**

Blair Foundation Path House family advocate Ms. Bloom testified that her role was supervising the visits and doing active parenting with the family. Ms. Bloom estimated only approximately eighteen out of the fifty-four visits at Blair Foundation were virtual. She had witnessed other infants going through a similar visitation situation during the Covid-19 pandemic, and the parents in those situations had been able to follow the required steps for reunification and created a bond with their infants. However, although Ms. Bloom completed the active parenting book with Father, a bond was not established between Father and Child because he did not take her advice about how to establish one. Father and Mother did not apply the active parenting curriculum to the visits at all and instead of maximizing the visitation time, Father often argued with Mother, had to be asked to step out from the visits on a few occasions and refused to be part of another visit. Father did not know where Child was developmentally and, although Child had started talking and was very talkative at her foster home, she would not talk to her parents at the visits. When Father visited with Child in August 2021, Child appeared to be afraid of him because she had not seen him since his last visit in January 2021. Ms. Bloom testified that since Father had failed several drug screens, he would not be able to care for Child alone and, because of the consistent fighting between the parents, she would not put Child in their care. (*See* N.T. TPR Hearing, 9/13/21, at 12-16, 19-20, 22-25, 28, 32).

Ms. Bloom observed Child with the foster parents when they would drop her off and pick her up from visits with her biological parents. She described Child as "light[ing] up" when with them. Ms. Bloom observed a bond between Child and her foster parents, was happy when with them and very upset when taken from them for a visit. She agreed that changing Child's goal to adoption was in her best interest because her needs were met and she was in a safe environment with the foster parents. (***See id.*** at 24-25).

**4.**

Ms. Scaife of the IFS Home Management Program worked with Child's family on the living conditions at the home from February 2020 until January 2021. (***See*** N.T. TPR Hearing, 9/13/21, at 74). On her first visit, she observed that leaking pipes had soaked the kitchen floor, the refrigerator was not working and there was no hot water tank. She worked with both Father and Mother together and noticed that Father got agitated very easily, but they were compliant. Father had a hot water tank installed and some leaks had been repaired. IFS was able to obtain a refrigerator, some furniture and household items for them. Despite these improvements, she recommended that Child not be returned to Father and Mother's custody because of their anger/relationship issues. Because of those continued problems, she supported the goal change to adoption. (***See id.*** at 74-78).

**5.**

Father testified that the most important thing to him in this situation is Child. He stated that he no longer used heroin and that the two times he tested positive for alcohol before visits with Child was from drinking the previous night. According to Father, CYS had mistaken him for someone else when they reported anger issues and that is why he mistrusted them. He testified that he was unable to get a job because CYS had him attending too many group sessions and that, once he did find a job, they increased his days with IFS because they wanted him to fail. By the time of his testimony on September 15, 2020, he was no longer incarcerated on the terroristic threats charge. (**See** N.T. TPR Hearing, 9/15/21, at 61, 65-66, 68, 70-71, 76).

Although he alleged that Ms. Barrett was incapable of doing her job, he said his threatening actions against her were due to months of frustration with CYS, not her personally, and he claimed that CYS was planning for his incarceration all along, targeting him and Mother from the beginning based on their perception of Mother, not on his actions. He said it was impossible to form a bond with his infant daughter through Facetime and, contrary to CYS testimony, he did interact with her. He believed that most of the information obtained by CYS was from his mother, who was biased against him and whom he characterized as evil. Father posted on social media because CYS is part of a "nationwide problem" that agitates and disgusts him because they require parents to attend services so that the agency can get funding. He admitted

that he still needs to remedy the problems that led to Child's removal but asked that he be given more time. (***See id.*** at 69, 72-73, 77-83).

On October 6, 2021, the orphans' court entered an order finding clear and convincing evidence to support involuntarily terminating the parental rights of Father pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8). Father timely appealed and filed a contemporaneous statement of errors.[5] ***See*** Pa.R.A.P. 1925(a)(2)(i).

## II.

## A.

The orphans' court terminated Father's parental rights pursuant to Section 2511(a)(1),(2), (5), (8) and (b) of the Adoption Act, which provide:

> **(a) General rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either

---

[5] We review the orphans' court's order for an abuse of discretion. ***See In re G.M.S.***, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted). Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." ***In re Interest of D.F.***, 165 A.3d 960, 966 (Pa. Super. 2017). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." ***In re S.H.***, 879 A.2d 802, 805 (Pa. Super. 2005). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re A.S.***, 11 A.3d 473, 477 (Pa. Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***Id.***

has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b).

It is well-settled that "[w]e need only agree with [the trial court's] decision as to any one subsection of Section 2511(a) and subsection (b) in order to affirm the termination of parental rights." *Int. of K.M.W.*, 238 A.3d 465, 473 (Pa. Super. 2000) (citation omitted).  For the following reasons, we conclude that the orphans' court correctly determined that CYS met its burden of proof under subsections 2511(a)(2) and (b).

**B.**

Father argues that the orphans' court erred in finding that CYS produced clear and convincing evidence to support the termination of his parental rights.  Although he admits that he "failed to take the steps to reunify with [C]hild," he argues that "Covid-19 has had such a tremendous and disastrous[] effect on his case that it would be improper not to adjust the lens through which his actions are viewed." (Father's Brief, at 11).  Specifically, he points to the fact that he had virtual visits with the Child that rendered him unable to maximize reunification efforts, and that when the visits were again in-person, "he was incarcerated and could not meaningfully participate." (*Id.* at 13).

We first address the court's termination of Father's parental rights pursuant to Section 2511(a)(2). *See Int. of K.M.W.*, *supra* at 473.

In a termination proceeding, the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2):  (1) repeated and continued

incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are "required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *In re J.R.E.*, 218 A.3d 920, 925 (Pa. Super. 2019) (citation omitted). "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *See id.* (citation omitted). "The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity that cannot be remedied are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted).

Where the parent is incarcerated:

the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his ... child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his ... children.

* * *

> Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life.

*In re Z.P.*, 994 A.2d 1108, 1120 (citation omitted). Further, "[t]he cause of incarceration may be particularly relevant to the Section 2511(a) analysis, where imprisonment arises as a direct result of the parent's actions which were part of the original reasons for the removal of the child." *Id.* (citation and internal quotation marks omitted).

Instantly, the orphans' court explains that:

> The relationship between [Child's parents] and CYS can be described in a few words as noncooperative and hostile. Each parent talked a good game on direct and cross-examination. Each parent asked for more time to improve, blaming everyone else for their shortfalls. As stated by the Pennsylvania Superior Court in *In Re: Adoption of R.J.S.*, 901 A.2d 502[,] 513 (Pa. Super. 2006) …
>
> > The Court cannot and will not subordinate indefinitely a child's need for permanency and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time … in which to complete the process of either reunification or adoption for a child who has been placed in foster care.
>
> … Petitioner, [CYS] has established a legal basis for terminating the parental rights of [Father.]

(Orphans' Ct. Op., at 10).

It is undisputed that Child, approximately sixteen-months-old at the time of the first TPR hearing, had been in foster placement since birth. CYS

- 19 -

presented clear and convincing evidence that the conditions that led to Child's placement continued to exist.

Father argues that he initially complied with the court's order that he complete a psychological evaluation and complete parenting classes, showed an interest in working with a provider to address anger management issues and began attending in-person visitation. (**See** Father's Brief, at 12) (citing N.T. TPR Hearing, 6/28/21, at 20). Although he admittedly "failed to take the steps to reunify with [C]hild," he asserts that, "but for Covid, [and his incarceration he] would have been able to make the necessary progress to reunite." (**Id.** at 9, 11); (**see id.** at 12). The evidence of record belies his argument.

Ms. Lusczek testified that Father's goals, including addressing his legal issues, attending anger management classes and remaining drug-free, remained the same throughout the life of this case, and that he was more focused on social media and blaming others than he was on making efforts to reunify with Child. (**See** N.T. Hearing, 6/28/21, at 20). He had multiple positive drug test results during the life of this case, which was a barrier to reunification. (**See id.** at 21-22). He was discharged from the anger management program at IFS due to his own volatile actions during the attempted treatment. (**See id.** at 22). Ms. Popovich testified that Father was given more reunification attempts than most because he was given two visits per week instead of one and was provided with every service available to CYS,

of which he elected not to avail himself, and the agency even provided him with alternative sources. (*See* N.T. Hearing, 9/13/21, at 65). Despite Father's claims that he did not have the benefit of in-person visits with his Child and that he could not meaningfully participate when the visits returned to in-person because of his incarceration, Ms. Bloom testified that only eighteen out of the fifty-four visits offered to Father were virtual due to Covid-19. (*See* Father's Brief, at 13); (N.T. Hearing, 9/13/21, at 32). Of the approximately thirty-six in-person visits he had in the two years since Child's birth and removal, Father argued with Mother, refused to be part of one visit and had to be asked to leave on others because of his volatile actions. (*See* N.T. Hearing, 9/13/21, at 14-16, 23-24).

In fact, Father's incarceration of which he now complains was due to his criminal actions against a caseworker attempting to provide him with reunification opportunities in this case. Not only were his actions criminal, but they also violated the express terms of the March 2, 2020 Permanency Plan order that he not threaten, harass or use vulgarity toward anyone at CYS or its service providers. Rather than working with his caseworkers so that he might reunify with Child, he focused on his anger and hatred toward CYS. In addition to his myriad social media posts, he threatened Ms. Barrett and her child, which resulted in the filing of criminal charges, his guilty plea to

terroristic threats and his incarceration. (**See** N.T. 6/28/21, at 28).[6] For him to utilize his own actions in this case that resulted in incarceration as a justification for his failure to bond with Child is not convincing. Moreover, it does not excuse his inaction in working toward reunification prior to the incarceration.

Based on the foregoing, despite Covid-19 and Father's incarceration, CYS provided clear and convincing evidence that due to his continued incapacity, he is unable to provide Child with the essential care necessary for her physical and mental well-being. The orphans' court did not abuse its discretion in finding that CYS presented sufficiently clear and convincing evidence to support termination based on Section 2511(a)(2).

## C.

Having determined that the court properly found that termination of Father's parental rights was appropriate under subsection 2511(a)(2), we now consider whether termination is in Child's best interest pursuant to subsection 2511(b).[7]

---

[6] Father also complains that he did not have a consistent relationship with his caseworker. (**See** Father's Brief, at 13). However, any inconsistency in caseworkers was in large part due to Father's criminal actions that resulted in his caseworker's removal for her own safety. In any event, as we stated above regarding his incarceration excuse, it does not alter the fact that he failed to avail himself of offered services.

[7] Father does not specifically address Section 2511(b). (**See** Father's Brief, at 11-14). However, we include our analysis of this section to provide a full review of the orphans' court's decision.

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. In particular, we review whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. It is well settled that intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child.

One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, with close attention paid to the effect on the child of permanently severing any such bond. The fact that a child has a bond with a parent does not preclude the termination of parental rights. Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. Notably, where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists.

It is sufficient for the trial court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. The trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

**Int. of K.M.W.**, **supra** at 475 (case citations and most quotation marks omitted).

Ms. Bloom testified that Father and Child really did not have a bond. (**See** N.T. TPR Hearing, 9/13/21, at 20). She stated that both biological parents failed to take her advice about what they could do to establish a bond with Child. (**See id.** at 28). When Father visited with Child in August 2021, Child appeared to be frightened of him since he had not visited with her since February 2021. (**See id.** at 20, 28). Child was bonded with her foster family

and Ms. Bloom agreed that changing her goal to adoption was in her best interest. (*See id.* at 25).

Ms. Lusczek also testified that Child was developmentally on target and had a bond with her foster family, which provided her with love, comfort, security and stability. (N.T. TPR Hearing, 6/28/21, at 24-25). She opined that it would be in Child's best interest to stay with the foster parents and that severing any bond with her biological parents would not negatively impact her in any way. (*See* N.T. TPR Hearing, 6/28/21, at 33-36). Ms. Popovich stated that the foster family was an adoptive resource and that Child's sibling also lived there. (*See* N.T. TPR Hearing, 9/13/21, at 63). Hence, the record supports the orphans' court's finding that the credible CYS witnesses established that the termination of Father's parental rights would best serve Child's interest pursuant to Section 2511(b) and we find no abuse of discretion in its decision to terminate Father's parental rights to Child and in changing its goal to adoption.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/23/2022